**NIOBRARA RIVER RANCH, L.L.C., a Nebraska Limited Liability Company, and Lee M. Simmons, Plaintiffs,**

v.

**Royce HUBER, Refuge Manager, Ft. Niobrara Wildlife Refuge; Ron Cole, Refuge Supervisor; Ralph Morgenweck, Regional Director for USF & W Region 6, Steven A. Williams, Director of United States Fish & Wildlife Service; Gale A. Norton, Secretary of the United States Department of the Interior, Defendants.**

No. 4:03CV3247.

United States District Court, D. Nebraska.

Aug. 19, 2003.

---

Paul D. Boeshart, Assistant United States Attorney, Lincoln, NE, for Gale A. Norton.

Victor E. Covalt, III, Ballew, Schneider Law Firm, Lincoln, NE, Kent C. Engdahl, Raynor, Rensch Law Firm, Omaha, NE, for Niobrara River Ranch.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case presents the interesting question of whether the United States Fish and Wildlife Service (the FWS or Service) wrongly denied a license to conduct a commercial canoeing[1] enterprise on the

---

1. The application refers to "vessels" which apparently include canoes, tubes and kayaks.

stretch of the Niobrara river in Nebraska that runs through the Fort Niobrara National Wildlife Refuge. The primary question is whether FWS denied the permit arbitrarily, capriciously or contrary to the law.

After a bench trial, I find and conclude that the FWS was within the law when it denied the permit. I, therefore, dismiss the plaintiffs' claims with prejudice, and enter judgment on the merits for the defendants. My reasons, including the required Fed.R.Civ.P. 52 findings of facts and conclusions of law, are set forth below.[2]

## I. BACKGROUND

### Introduction

In order to understand the arguments of the parties, it is also necessary to understand both the facts and the history of the law regarding the federal government's interest in, and administration of, the Fort Niobrara National Wildlife Refuge (the Refuge), and the beautiful Niobrara river (the river) that runs through it. Presenting the "pure facts" and "historical legal facts" together for purposes of clarity, I proceed to that task next.

### The Record

The administrative record subject to review is found at filing 24 (Ds.'s Index of Evid. Regarding Designation of Admin. R., including exhibits A through M) (hereinafter Ex. '___', Admin. R.) It was a made a part of the evidentiary trial record without objection.

Without objection, the court also took judicial notice for the purposes of evidence

of filing 22 (Defendants' Index of Materials Submitted in Supp. of Request to Take Judicial Notice, including exhibits 101 through 110). This index contained various executive orders, extracts from FWS manuals, and Federal Register notices. Without objection, the court also took judicial notice of another executive order. (Trial Ex. 1 (Executive Order 12996).) Filing 22 and Trial Ex. 1 comprise the Judicial Notice Materials. The pertinent trial record thus consists of filing 22, filing 24 and exhibit one.[3]

The facts described below are derived from the foregoing sources. Historical legal facts described below are derived from the evidentiary trial record as well as the legal decisions, notices, executive orders, statutes, regulations and similar governmental materials regularly published by the United States.

### The Site

The Refuge is 19,131 acres in size and located along both sides of the river in north-central Nebraska. (Ex. L, Admin. R., Fort Niobrara National Wildlife Refuge Comprehensive Conservation Plan, p. 1 (hereinafter "CCP, p. ___").) One district court has described the river as follows:

> The Niobrara, a unique river with abundant resources that runs through north-central Nebraska, is known for its historical, paleontological, archaeological, and ecological treasures. Its forests abound with ponderosa pine, American elm, but [sic] oak, green ash, basswood, hackberry, and black walnut trees. There is striking bio-diversity among

---

For the sake of convenience, and since the parties do not point out any significance to the specific type of craft, I refer only to "canoes" or "canoeing."

**2.** Any factual finding that should more properly be considered a conclusion of law shall be so construed. In the same vein, any con-

clusion of law that should more properly be considered a factual finding shall be so construed.

**3.** Because injunctive relief is not warranted, I do not discuss the evidence offered solely for non-merit based arguments such as irreparable injury. (See filings 14 and 15).

the vegetation, where 160 plant species from eastern, western, and northern forest ecosystems intermingle along the River valley. The Niobrara provides shelter and homes for bald eagles, turkeys, grouse, quails, doves, pheasants, ducks, and geese. It is also home to several threatened and endangered species, including the peregrine falcon, the interior least tern, the piping plover, and the whooping crane. Palaeontologists find a wealth of artifacts on the fossil beds along the Niobrara, including deposits from eighty species of extinct vertebrates. In one fossil excavation site, at least 146 vertebrate species were found. Of the 164 cataloged fossil excavation sites, 15 were rated as internationally significant, and 37 were rated nationally significant. The River was named one of the 10 best canoeing rivers in the nation by Backpacker magazine, and one of the eight special camping areas in the nation by Outside magazine.

*National Park & Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7, 9–10 (D.D.C. 1999) (internal citations omitted).

The Refuge is owned by the United States of America and managed by the FWS. The Refuge was established by Executive Order No. 1461, signed by President William Howard Taft on January 11, 1912, as a "preserve and breeding ground for native birds." (Filing 22, Exhibit 101, Judicial Notice Materials) (hereinafter "Ex. '___', Jud. Not. Mat").[4]

### Federal Regulation of the Refuge and River

As a National Wildlife Refuge, the Refuge is managed in accordance with the National Wildlife Refuge System Administration Act of 1966, Pub.L. No.89–669, 80 Stat. 927 (codified as amended in scattered sections of 16 U.S.C, largely at 16 U.S.C. §§ 668dd 668ee) (the "Refuge Act"). The mission of the National Wildlife Refuge System is "to administer a network of lands *and waters* for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd (a)(2) (emphasis added). The Refuge Act recognizes that compatible wildlife-dependent recreational uses within refuges "should be facilitated, subject to such restrictions or regulations as may be necessary, reasonable, and appropriate." *Id.* at § 668dd(a)(3)(D).

The Refuge Act, at 16 U.S.C. § 668dd(c), provides, in part:

> No person shall ... in any area of the [National Wildlife Refuge] System ... enter, use, or otherwise occupy any such area for any purpose; unless such activities are performed by persons authorized to manage such area, or unless such activities are permitted either under subsection (d) of this section or by express provision of the law, proclamation, Executive order, or public land order establishing the area, or amendment thereof....

The foregoing statutory prohibition has been implemented by the FWS through regulation (50 C.F.R. §§ 27.11–97 (2002)), and boating is specifically regulated by 50 C.F.R. § 27.32. "The use of boats in national wildlife refuges is prohibited except

---

**4.** Since it became a wildlife preserve in 1912, the Refuge has been expanded several times. *See* Executive Order No. 1642, signed by President Taft on November 14, 1912, (Ex. 102, Jud.Not.Mat).; Executive Order No. 3256, signed by President Woodrow Wilson on March 31, 1920, (Ex. 103, Jud.Not.Mat); Ex-

ecutive Order No. 7301, signed by President Franklin Roosevelt on February 21, 1936, (Ex. 104, Jud.Not.Mat). The final expansion occurred in 1986, when the Nebraska Public Power District quit-claimed land to the United States that included the Cornell Dam and Power House.

as may be authorized under and subject to the requirements set forth below." *Id.*

The Refuge Act at 16 U.S.C. § 668dd(d)(1) further provides, in part:

The Secretary is authorized, under such regulations as he may prescribe, to—

(A) permit the use of any area within the [National Wildlife Refuge] System for any purpose, including but not limited to hunting, fishing, public recreation and accommodations, and access whenever he determines that such uses are compatible with the major purposes for which such areas were established....

Public recreation was recognized by Congress as a legitimate use in the National Wildlife Refuge System in 16 U.S.C. § 460k. The Secretary of Interior was authorized therein to "administer such areas or parts thereof for public recreation when in his judgment public recreation can be an appropriate incidental or secondary use" and authorized him "to curtail public recreation use generally or certain types of public recreation use within individual areas or in portions thereof whenever he considers such action to be necessary...." *Id.*

In 1997, Congress amended the Refuge Act by enacting the National Wildlife Refuge System Improvement Act, Pub.L. No. 105–57, 111 Stat. 1252–1260 (codified as amended at 16 U.S.C. §§ 668dd–668ee). Congress mandated within the amended Refuge Act that the Secretary of the Interior, and thus the FWS, develop comprehensive conservation plans for each national wildlife refuge. Congress also directed the Service to "facilitate[ ]" subject to "restrictions" and "regulations" certain compatible recreational uses. 16 U.S.C. § 668dd(a)(1)(3)(D). The Service was also directed by Congress in section 668dd(e)(1)(E) to "manage the refuge or planning unit in a manner consistent with the plan...."

Since 1976, the FWS has been responsible for managing a 4,635–acre portion of the Refuge as a wilderness area pursuant to the Wilderness Act of 1964, 16 U.S.C. §§ 1131–1136. (CCP, p. 38.) Virtually all of the river used by the public on the Refuge is inside the wilderness area, as the wilderness boundary is a few hundred yards downstream from the launch point below Cornell Dam, which is owned by the FWS. A wilderness area is to be managed by the Service "to preserve its natural conditions...." 16 U.S.C. § 1131(c). River recreation, such as canoeing, is clearly permissible as long as it is managed by the FWS to preserve "outstanding opportunities for solitude or a primitive and unconfined type of recreation" experience in each wilderness. 16 U.S.C. § 1131(c)(2).

In 1991, a 76–mile stretch of the Niobrara river, including the entire stretch of the river within the refuge boundaries, was designated "scenic" under the National Wild and Scenic Rivers Act of 1968. 16 U.S.C. §§ 1271–1287. Such rivers "shall be preserved in free-flowing condition, and ... they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. The Service is given the express responsibility to ensure these protections are enforced. "[T]he 40–mile segment designated by this subparagraph located within the [Refuge] shall continue to be managed by the Secretary [of the Interior] through the Director of the United States Fish and Wildlife Service." 16 U.S.C. § 1274(a)(117)(A).

The regulation that governs the issuance of Special Use Permits for commercial uses inside refuges, the type of permit at issue in this case, reads:

Soliciting business or conducting a commercial enterprise on any national wild-

life refuge **is prohibited** except as may be authorized by special permit.

50 C.F.R. § 27.97 (2002) (emphasis added).

### The Conservation Plan and the Moratorium

Under the amendments to the Refuge Act, enacted in 1997, the Service was required to develop comprehensive conservation plans (CCPs) for all refuges within 15 years. Title 16 U.S.C. § 668dd(e)(1)(A) implemented Congress's mandate for refuge comprehensive conservation plans:

[T]he Secretary shall—

(i) propose a comprehensive conservation plan for each refuge . . .;

(ii) publish a notice of opportunity for public comment in the Federal Register on each proposed conservation plan; [and]

(iii) issue a final conservation plan for each planning unit consistent with the provisions of this Act and, to the extent practicable, consistent with fish and wildlife conservation plans of the State in which the refuge is located. . . .

Each CCP was to be proposed in the Federal Register for public comment. Upon completion of a CCP, the Service was directed to manage the refuge in a manner consistent with the CCP and was directed to revise the plan at any time conditions that effect the Refuge are deemed to have changed significantly. 16 U.S.C. § 668dd(e)(1)(E).

The Service followed the Refuge Act's direction regarding the development of a CCP for the Refuge. Although finalized in September of 1999, the Refuge CCP at issue here was originally published in the Federal Register on May 4, 1999, at 64 F.R. 23852 (Ex. 109, Jud.Not.Mat.), and subsequently extended for comment and published on July 15, 1999, at 64 F.R. 38210 (Ex. 110, Jud.Not.Mat.). In the summary page of the CCP it was noted that the CCP was an updated and revised version of the Draft Comprehensive Conservation Plan issued earlier in 1999. (CCP, p. 1.)

The public was involved in the process that led to the development of the draft CCP and the final CCP through a various meetings, personal communications and distribution of the draft plan. (CCP, p. 25). In addition, a period totaling 105 days was granted to interested parties to provide written comments to the draft CCP, before the final plan was issued in September of 1999. (*Id*). The Service made various changes to the draft CCP and included them in the final CCP as a result of the comments and information received during the comment period. (*Id*).

Since 1976, when the river was designated as wilderness pursuant to the Wilderness Act, the number of people canoeing the river within the Refuge appears to have steadily increased (at least until recently). In the CCP, the Service found that between 1993 and 1997 the rate of increase was steep (about 30%). It rose from about 23,000 visitations to about 30,000 visitations annually in just four years. (CCP, p. 8.)

In this regard, the CCP states:

Canoeing the Niobrara River was referred to as "increasing in popularity" in 1972. However, the estimated 2,960 activity hours reported in 1972 in the Fort Niobrara Wilderness Study was not considered excessive to prevent inclusion of the River corridor in the area to be designated as wilderness pursuant to criteria under the Wilderness Act. Since then, the number of people canoeing and tubing down the Niobrara River within Fort Niobrara NWR has steadily increased. Beginning in 1993, outfitters and the Service recorded the number of people canoeing and tubing the River through the Refuge. This information

showing the increase in floating use is found in Figure 1. Increased River use has raised concerns about disturbance to wildlife, impacts on vegetation, the quality of experience for Refuge visitors, and compatibility with the Wilderness Act and the Wild and Scenic River Act. Management began to address River recreation concerns through the Environmental Assessment process in 1994 and efforts are ongoing.

(CCP, p. 8.)

Figure 1, referred to in the foregoing quotation, and presented in the CCP, is reproduced below:

Figure 1. Canoeing - Tubing Visitation 1993-1997

(Id.)

In the CCP, the Service announced that it was instituting a temporary moratorium on new outfitters. (CCP, p. 21). This temporary limit, coupled with strict enforcement of the laws governing floating the river, was instituted to stem the apparent overcrowding situation on the stretch of the river through the Refuge. As stated in the CCP, until a study could be completed, the temporary moratorium was, in the Service's judgment, the most logical way of controlling apparent overcrowding without depriving all visitors of the experience of canoeing the river. The Service said:

This temporary measure has been criticized as unfair, inadequate, and without basis on hard evidence and science. However, the Service believes that this interim management policy is better than complete shutdown of River use on this stretch of the Niobrara River (worst case scenario) as discontinuing all use would be no more justifiable than allowing uncontrolled growth of use. At this time, there is no logic in depriving all visitors of the wilderness experience.

(CCP, p. 21.)

The development of the CCP, which included a public NEPA process resulting in an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI), was deemed necessary by the Refuge Act and the Service to guide management of the Refuge over the next 15 years. (CCP, pp. 1, 113–21.) Included in the CCP was the call for the Service to institute a management plan to deal with the recreational use of the river as it flows through the Refuge.

To be specific, in 1999 the CCP stated that the Service would prepare a River Management Plan (RMP or Plan) within two years. (CCP, p. 21). Despite this written assurance, the RMP has not yet been completed. The Plan, which is now scheduled to be in place prior to the 2004 river season, will be based largely on scientific research conducted during the past four years by researchers from Kansas State University. (Ex. M, Admin.R.)

These researchers are studying the impact river users have on the riparian habitats supporting wildlife and vegetation along the river within the Refuge. The results of this research, coupled with information gained from talking to Refuge visitors, outfitters, Refuge staff and others, will form the knowledge base for the RMP. The Plan will define acceptable use levels for weekdays and weekends that meet the legal mandate. (CCP, p. 21.)

The defendants concede that some canoeing is a compatible use within the Refuge and on the river. (CCP, p. 94 ("River recreation is compatible"); Filing 23, Br. in Supp. of Ds.'s Mot. to Dismiss at 9, 18.) However, that concession is limited by express caveats, including the stipulation in the CCP that "[d]uring the development of the River Recreation Plan, no additional permits for outfitting on the Refuge will be issued and River use will be capped at 1998 levels." (CCP, p. 94).[5]

### The Permit Application and the Denial

On about November 26, 2003, the plaintiffs filed their application for a Special Use Permit (SUP) with FWS. (Ex. A, Admin.R.) It was addressed to Mr. Royce Huber, the Refuge manager.

The plaintiffs first observed that:

Applicant understands that river use on weekends in the summer was capped at 1998 levels. (*See* "Ft. Niobrara National Wildlife Refuge Comprehensive Conservation Plan" "CCP") at page 51; *see also* "CCP" appendix E, "Comparability Determinations", p. 100. According to annual river use surveys compiled by the Ft. Niobrara National Wildlife Refuge, the total number of vessels launched in 1998 from both outfitters and privately was 16,253; total number of people was 27,619. The years 1999 and 2000 show a steady decline in usage

and in the river use summary of 2001, the total number of vessels was 10,173; the number of people was 15,741. The number of outfitters were limited to eleven, as a "Moratorium" according to Outfitter Usage Reports for 2002. Only eight outfitters applied for special use permits for 2002.

Based on this data, it appears that the 1998 cap on river usage has never been violated up to the year 2002 and the number of outfitters has also decreased. In fact, granting this permit application will not and cannot result in any violation of the caps as imposed by the CCP. Thus, the Applicant's request for a special use permit will not violate these caps on use levels or outfitter numbers over the 1998 standards.

(*Id.*)

Then, the plaintiffs framed and limited their request this way:

Applicant Niobrara River Ranch, LLC requests 60 watercraft vessel decals. Applicant agrees to limit the number of customers using its service through the Refuge to not more than 30 per morning and 30 per afternoon slots for each Saturday and Sunday from May 1 to October 1. Applicants agree not to request any additional annual passes, as allowed under "Special Conditions", section 17, paragraph 6 for year 2003.

(*Id.* at 2.)

On January 6, 2003, Mr. Huber denied the permit. (Ex. C, Admin.R.) In his two page letter, Mr. Huber first provided the background for his denial:

Due to the rapidly increasing commercial use of the Niobrara River on the Refuge, the U.S. Fish and Wildlife Service (Service) became concerned about the impacts on wildlife resources and the

---

**5.** It appears that the River Recreation Plan referenced at page 94 of the CCP is the same

document as the River Management Plan referenced at page 21 of the CCP.

quality and safety of a wilderness experience by the public. In 1993, a moratorium was issued allowing no new commercial operations, other than the 11 commercial outfitters that were in place at the time of the moratorium. Since that time, there have been requests for SUPs to provide these commercial privileges but none have been granted nor have any permits been transferred to new owners through purchase of existing businesses. In 1999, with public input and involvement, the Service completed the Comprehensive Conservation Plan (CCP) which directs the management of Fort Niobrara National Wildlife Refuge for the next 12 to 15 years. In that document, the Service identified a need to develop a "River Management Plan" which will address future commercial outfitting privileges on the Refuge. The CCP also addressed a need for the Service to conduct an avian study to determine what affect river recreation is having on avifauna. The Service contracted with Kansas State University to conduct this study which tentatively is to be completed in 2003. This document along with other relative information will be used by the Service to complete the "River Management Plan" and a "Wilderness Management Plan". All of these measures are necessary to ensure compliance with the National Wildlife Refuge System Improvement Act of 1997 which states that wildlife conservation is the priority of the System lands and that the Secretary of Interior shall ensure that the biological integrity, diversity and environmental health of refuge lands are maintained.

(*Id.* at 1.)

Mr. Huber then stated that "the Service cannot issue [the permit] to you or other interested individuals or entities until the Service has acquired the information and completed the plans identified above." (*Id.* at 2.) Mr. Huber advised the plaintiffs

that they could appeal his decision to Ron Cole, the State Supervisor of the FWS. (*Id.*)

On January 10, 2003, the plaintiffs appealed Huber's decision to Mr. Cole. (Ex. D, Admin.R.) In particular, they asserted that:

As we discussed, my client, Niobrara River Ranch, operates [an] upscale resort with cabins near the river downstream from the Refuge. Mr. Lee M. Simmons, owner of Niobrara River Ranch LLC and its general manager, owns the land on both sides of the river from near Berry Bridge to Smith Falls. The Special Use Permit is particularly designed to allow it to use that portion of the river to enhance the Niobrara experience for Niobrara River Ranch's guests without any impingement upon the terms or the standards set under the CCP.

Recreational use of the river has a long standing history. It pre-dates even the creation of the Refuge itself. Recreational use of the river was expressly approved as a compatible use in the CCP. These two facts mean that restricting access thus must be justified. Without such justification, restrictions are arbitrary and capricious by definition.

As you know, the Ft. Niobrara National Wildlife Refuge CCP instituted a "temporary" cap for canoeing on the river through the Refuge at 1998 numbers which were approximately 27,619 visitors through eleven (11) outfitters. It is my understanding that in year 2002 that there were only nine (9) outfitters still operating through the Refuge. The number of people accessing the river at the Cornell Dam site in 2001 was 15,741. We expect final reports for 2002 to be around 15,000 visitors. Thus, if granted, my client's utilization of access under

the Special Use Application mathematically cannot cause usage to exceed the cap on total visitors or the number of outfitters using the river. Our Special Use Permit also addresses issues of overcrowding and actually proposes a better system of river management than is presently in place. It exceeds the terms and condition imposed in 2002 on the "grandfathered" outfitters.

The "two-year moratorium" was imposed under the CCP adopted in September, 1999 to allow completion of the River Management Plan and their Wilderness Stewardship Plan. These Plans are more than two years past due and at least two more years of delay are projected. Thus, the "moratorium" has become a permanent restriction on prior lawful use. This is having a detrimental impact on the economy of Cherry County and surrounding areas. As we discussed, Yucca Dunes, an upscale outfitter and operator of a retail store in Valentine, is closing its doors because it could not compete without access to the river through the Refuge. Their permit application was denied by your office a few years ago. It is a sad consequence that businesses of the quality of Yucca Dunes must fail while lesser operators enjoy huge profits from their special status as permit holders by virtue of the "moratorium."

(*Id.* at 1–2.) The plaintiffs supplemented their appeal in a another detailed letter dated January 31, 2003. (Ex. F, Admin.R.)

On January 31, 2003, Mr. Cole denied the appeal. (Ex. E, Admin.R.)[6] He explained his reasons for the denial this way:

Thank you for your letter of January 10, 2003, appealing the denial issued to your client by the Project Leader at Fort Niobrara National Wildlife Refuge (NWR). I have carefully read the letter of January 6, which denies your client's request for a canoe outfitter Special Use Permit (SUP) along the Niobrara River within the NWR. I have carefully read your thoughtful appeal of this denial, and have also reflected on our phone conversation of January 8. After considerable thought, I concur with the decision to deny your request for the SUP. Denial of your request is consistent with similar SUP requests the Refuge has received since the Comprehensive Conservation Plan (CCP) was completed in 1999. The CCP places a cap on weekend outfitters and also prohibits the issuance of SUP's to new outfitters. The purpose of this was to diminish impacts to the resource by reducing the high peak use periods that occurred on weekends by dispersing river traffic and spreading it out over the entire week. These and other measures of the 1999 CCP ensure compliance with the 1997 National Wildlife Refuge System Improvement Act, which states that wildlife conservation is the priority of refuge lands and that the Secretary of Interior shall ensure that the biological integrity, diversity, and environmental health of refuge lands is maintained.

The crux of this issue is not your client's ability to perform or your client's potential revenue losses. It is not about lost opportunity to the public, for there are still thousands of river recreationists from all over Nebraska and other states enjoying the Niobrara River by paying professional outfitters to guide them along its waters as it winds through the Refuge and beyond. What is central to this issue is the inappropriateness for

---

**6.** Although I attach no significance to the point, it appears that the plaintiffs' supplemental letter of January 31, 2003 crossed in the mail with Mr. Cole's denial letter of the same date.

the Service to issue new Special Use Permits to new clients until we have a better understanding of the impacts that cumulative river recreation is having on the environment. We need to understand what the threshold levels for these activities are, what the impacts on wildlife resources are, and what the impacts on the river wilderness values will be. As directed by the CCP, we are developing a River Management Plan (RMP) and associated Wilderness Stewardship Plan (WSP). You accurately point out in your letter that neither of these is complete and both are significantly behind schedule. To complete these plans, it was decided to conduct a peer-reviewed study by a noted university to gather the information needed to write effective step-down plans. Kansas State University was selected as the principle [sic] investigator and they have been populating the database with cutting edge information for the past 2½ years. It is anticipated they will be providing us a draft of this study by spring of this year. Our RMP and WSP will reflect the high quality of this study. A thorough understanding of all the impacts will allow us to continue to provide quality recreation for river enthusiasts and still maintain the wildlife and wilderness values the river users come to expect. In the meantime, the Niobrara River continues to be enjoyed by thousands of people each year. River outfitters continue to provide their valuable services both on and off the Refuge. We will diligently pursue the completion of the RMP and WSP. These plans will help guide us through the waters of sound river management. In many ways, these plans serve the same purpose to our stewardship of the Niobrara River as good river guides do to their clients. Like a seasoned guide, if the plans are well prepared, the float will be much easier and enjoyable for all. I hope that

you and your client will be active participants in the formation of these plans.

(*Id.* at 1–2.)

On February 3, 2003, the plaintiffs appealed Mr. Cole's denial decision to Ralph Morgenweck, Regional Director of FWS in Denver. (Ex. G, Admin.R.) They made essentially the same arguments that they had made to Mr. Huber and Mr. Cole. In addition, they requested oral argument.

The request for oral argument was granted on March 3, 2003. (Ex. I, Admin.R.) It appears that the argument was heard by Mr. Morgenweck on May 1, 2003. (Ex. J, Admin.R.)

On May 22, 2003, counsel for the plaintiffs supplemented the record with the following:

I am enclosing four pages produced by Mr. Huber showing a continued decline of usage of the Ft. Niobrara NWR launch site in year 2002. He reports that a total of 15,185 persons used the launch site in 2002. This is slightly less than 55% of the number of people who used the launch in 1998, the "base year" for the "moratorium." That is, you have had a 45% decline in the number of people observing the scenic river in the NWR since the moratorium was put in place. As I emphasized in our meeting, the 1996 act encourages and makes *increased* family oriented recreational use of wildlife refuge system a priority. This stands as a stark contrast to the *decreased* use of the Ft. Niobrara NWR caused by the CCP and Mr. Huber's management.

I also wish to emphasize that 13,999 people used outfitters in 2002 to go through the Ft. Niobrara National Wildlife Refuge as compared to 1,186 who did not use outfitters. This means that **92.19%** of the persons viewing the scenic river through the Ft. Niobrara National

Wildlife Refuge depended on an outfitter.

(Ex. K, Admin. R. (emphasis in original).)

On May 30, 2003, Mr. Morgenweck denied the appeal. (Ex. M, Admin. R.) He gave detailed reasons for his decision, and they were these:

In 1999, the Fish and Wildlife Service (Service) completed the Comprehensive Conservation Plan (CCP) for Fort Niobrara. The purpose of the CCP process, as it relates to the 1997 Refuge Improvement Act, is to provide management plans for all the National Wildlife Refuges (NWR). One of the many issues which the CCP addressed was how to develop a reasonable and fair way to determine appropriate limits on usage of the Niobrara River downstream of the Cornell Dam.

The Service is committed through the CCP process that no new SUPs would be issued; they made verbal agreement with the existing outfitters to limit specific types of uses on the existing permits until a final River Management Plan (RMP) is produced.

In your written and oral presentations, you raise several concerns. You state that the Service does not have the authority to control activities on the Refuge portion of the Niobrara River. The Service was accorded exclusive management authority by Congress as part of the Wildlife and Scenic River System on the Refuge portion of the river and the National Park Service (NPS) on the remainder of the river. By law, Congress holds the Service and NPS accountable for the preservation and management of this national resource.

You state you do not believe the Service has the authority to require an SUP and that commercial outfitting is a compatible use, not a special use, and thus requires only a recreational access fee. Under 50 CFR 27.97 "... Conducting a commercial enterprise on any NWR can only be authorized by special permit." Therefore, the Service is required, by law, to issue an SUP for commercial outfitting and guiding on Fort Niobrara NWR. Refuge lands are public property and the government is directed by law on how to administer this property. Use of refuge lands as granted by an SUP is a privilege, not a right; otherwise all citizens could use refuge lands any way they see fit, often jeopardizing the purposes for which the refuge was established.

You state that the moratorium on guiding, as established in 1993 and supported in the 1999 CCP, is unlawful. The National Wildlife Refuge System (NWRS) Administration Act (16 U.S.C. 668dd, et seq.) and rules found in 50 CFR Chapter I, Subchapter C, close refuge land and water to all forms of public use, including entry, until the Service takes affirmative action to permit use. Subpart C, 25.31 states whenever public access or use is permitted, or that access or use is curtailed, the public may be notified by the following methods:

(a) Official signs posted conspicuously at appropriate intervals and locations,

(b) Special regulations issued under the provisions of 26.33 of the Subchapter C,

(c) Maps available in the office of the Refuge Manager, Regional Director, or Area Director, or

(d) Other appropriate methods which will give the public actual or constructive notice of the permitted or curtailed public access, use or recreational activity, i.e., local newspaper, radio, and television.

In 1999, the Service committed in the CCP that no new SUPs would be issued. This decision is directly supported by the Refuge Improvement Act of 1997, to

". . . ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans."

You state that you believe that outfitter SUPs have been issued to "favorites" and that the Service "subtly discourages" outfitters from using their permits. It is refuge policy to issue SUP's using a variety of procedures including lottery, chronological order, reservation systems, and open bid process. Reissuing SUPs to existing users (providing their past performance meets the conditions of the permit) year after year is common practice among many government agencies.

You state that the RMP has yet to be completed. I am pleased to report that this study by Kansas State University has just concluded, and that a draft will be provided for peer review in July of this year. I would like to provide you a brief update on what the principle [sic] investigator has relayed to us thus far. This researcher (a Graduate Research Assistant, Kansas Cooperative Fish and Wildlife Research Unit, Kansas State University) has completed the first three or four chapters of his thesis and will submit them to his major advisor in early June. He continues to work with a statistician on the very large behavioral data set (45,000 observations).

Some draft results reported thus far:

Field Season 2000—Community Level Responses (Pilot Study)

Several bird species were found to be sensitive to recreation disturbance along the river, including common yellowthroat, eastern kingbird, belted kingfisher, great blue heron, spotted sandpiper, and wood duck.

Field Season 2001 and 2002—Population Level Responses

Ground nesting songbirds

Predators were shown to increase their presence in the river corridor as the avian breeding season progressed for pairing, to nesting, to fledgling stages. None of these results differed in recreated vs. non-recreated zones of the Refuge.

Overall, birds with a nesting ecology similar to the common yellowthroat most likely do not pull off many young during the breeding season due to high depredation rates and a good chance of the presence of predators in their nesting habitat. This is most likely due to the regional habitat characteristics found along the Niobrara River. Birds that use these unique habitats key in on them and use them to attempt a successful breeding season. However, due to the limited extent of these habitats, and the fact that these animals are "packing in" to these areas, it makes the river corridor attractive to predators. The river is a good source of cooler refugia and water, which also attracts other wildlife. At the **current** river recreation level (15,000–17,500 people annually), songbird breeding and presence of predatorial species within the corridor are relatively unaffected by recreation. **However,** if human activity increases in the future, there is literature supporting that predators (both avian and mammalian) may be attracted to this, thus causing even more predator activity within the immediate corridor and potentially leading to even less of an already meager nest success rate in ground nesting songbirds such as the common yellowthroat. Also, the presence of more people may increase the foot traffic in riparian habitant that is immediately

adjacent to the river which could negatively impact habitats and create a source of disturbance to birds and other wildlife using these areas for breeding and refuge.

The researcher hopes to complete his thesis and defend it at the end of June, followed by a report/presentation at Fort Niobrara NWR in July. However, the avian behavior/river recreation use data (Chapter 4) is a critical component of the project that must be completed before a final report is presented to the Service.

The RMP, when complete, will reflect the results of this study, incorporating all biological and river use data available through an open public process. It will also include data referenced in your letter of May 22. It will be critical that actual river use continue to be monitored. Special Use Permits will be issued in a way that allows for optimum management of river use. The RMP will allow for a thorough analysis of how permittees are selected. We anticipate that a new SUP selection process will be implemented for the upcoming 2004 season.

Our goal is to provide quality recreation for river enthusiasts and still maintain the wildlife and wilderness values the river users come to expect. We will diligently pursue the completion of the RMP and hope that you will be a participant in the public review of this planning process.

(*Id.* at 1–4 (emphasis in original).)

7. Even if the plaintiffs had prevailed on the merits, and while I could order other types of relief, it is doubtful that I could issue a mandatory injunction requiring the issuance of the permit. But, since the plaintiffs have not prevailed on the merits, I do not reach this question.

8. At oral argument, I asked one of the plaintiffs' able lawyers whether he had any cases

### These Proceedings

This suit followed on June 26, 2003. The complaint sought declaratory and injunctive relief.[7] (Filing 1.) On July 21, 2003, the court, at the request of the parties, expedited the trial of this case. (Filing 19). Trial, immediately followed by oral argument, was held in the late afternoon and evening of August 12, 2003.

## II. ANALYSIS

### Introduction

Ultimately, I conclude that the Service's denial of the permit was lawful even though the Service has been late in the development of its promised river management plan. *See, e.g., United States v. Hells Canyon Guide Serv.*, 660 F.2d 735, 737 (9th Cir.1981) (even though the Secretary of Agriculture had not promulgated regulations regarding the use of a national recreation area and instead had imposed a moratorium on commercial float permits, denial of a license to conduct boating business by guide service was lawful and the district court properly enjoined the operator from conducting his boating operation on the Snake River in the Hells Canyon National Recreation Area.) My explanation for this decision is set forth in the following portion of this memorandum.

The plaintiffs argue that the license moratorium and the permit denial were arbitrary and capricious and contrary to the law. They also make a Tenth Amendment claim that I summarily deny along with any other claims that were not briefed.[8]

which supported the Tenth Amendment claim. Candidly, he said he did not. I cannot find any either. Moreover, it is not apparent why the Tenth Amendment has been violated. Because the claim has not been briefed, I deny it without further comment. *See, e.g.,* NELR 39.2(c)("[T]he failure ... to discuss an issue in the brief submitted may be treated as an abandonment of that party's position on any issue not discussed.")

### Jurisdiction and Scope of Review

As a preliminary matter, it is necessary to address the government's jurisdictional argument. An introductory explanation of the law regarding the "arbitrary, capricious and contrary to law" standard is also helpful.

In cases such as this, where jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 2201, this court's standard of review is under the Administrative Procedure Act (APA). See 5 U.S.C. §§ 701–706. Where judicial review is authorized, this court must limit its review to a determination of whether the record of the administrative proceedings reveals that the agency action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to the law. 5 U.S.C. § 706(2)(A).

However, where the underlying statute precludes judicial review or the agency action in question "is committed to agency discretion by law" judicial review is prohibited. 5 U.S.C. § 701(a)(1)-(2). Thus, "before any review at all may be had [under the APA], a party must first clear the hurdle of § 701(a)." Heckler v. Chaney, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (The Food and Drug Administration's decision not to take enforcement action to prevent the use of drugs for the purposes of implementing the death penalty by means of lethal injection was not subject to review).

█ Here, the government contends, although not vigorously[9], that the discretion afforded the Service under 16 U.S.C. § 668dd(e)(1)(A)—to issue the moratorium as a part of the comprehensive conservation plan—is so broad as be beyond review. In other words, the government argues that under 5 U.S.C. § 701(a)(2) judicial review is unavailable. I disagree.

The statute, 16 U.S.C. § 668dd(e)(1)(A), requires the FWS to issue a "comprehensive conservation plan." While the discretion afforded the Service in the preparation and administration of the plan is clearly broad, it is not without enforceable boundaries. For example, the statute requires the FWS to manage a refuge "consistent with the [comprehensive conservation] plan," 16 U.S.C. § 668dd(e)(1)(E), and the FWS is specifically required to identify and describe "opportunities for compatible wildlife-dependent recreational uses." 16 U.S.C. § 668dd(e)(2)(F). The statute also specifies that "compatible wildlife-dependent recreational uses ... shall receive priority consideration in refuge planning and management...." 16 U.S.C. § 668dd(a)(3)(C). Indeed, when the FWS determines that "a proposed wildlife dependent recreational use is a compatible use within a refuge, that activity should be facilitated, subject to such restrictions or regulations as may be necessary, reasonable and appropriate." 16 U.S.C. § 668dd(a)(3)(D).

The Refuge Act describes "compatible use" to include such "wildlife dependent recreational uses" as "will not materially interfere with or detract from the fulfillment of ... the purposes of the refuge." 16 U.S.C. § 668ee(1). This "compatible use" determination must be made by "sound professional judgment," id., and that term is defined, in part, to mean a conclusion "that is consistent with principles of sound fish and wildlife management and administration, [and] available science and resources...." 16 U.S.C. § 668ee(3). The terms "wildlife-dependent recreation" and "wildlife dependent recreational use" are defined to mean a "use of a refuge involving hunting, fishing, wildlife observa-

---

9. During oral argument, the very capable Assistant United States Attorney defending the case candidly told me that while he did not wish to abandon this argument he did wish to argue it either.

tion and photography, or environmental interpretation." 16 U.S.C. 668ee(2).

In short, the law requires the Service to (a) to prepare a CCP; (b) manage the refuge in accordance with the CCP; and (c) pursuant to the CPP, and among many other values, identify, facilitate, give priority to and regulate compatible wildlife-dependent recreational uses. The law sets a specific standard of care for the FWS employees to meet when identifying, facilitating, planning for and regulating those uses. Consequently, the discretion of the FWS is not absolute or unfettered and judicial review is not precluded under 5 U.S.C. § 701(a)(2). Thus, judicial review is available to determine whether Service's actions were arbitrary, capricious, an abuse of discretion, or otherwise contrary to the law. 5 U.S.C. § 706(2)(A).

There being no bar to judicial review, I turn then to the scope of my review under the APA. As the word "comprehensive" suggests, 16 U.S.C. § 668dd(e), requiring the development and implementation of a "comprehensive conservation plan," of necessity also requires the FWS to consider and balance a wide variety of competing interests such as the overall purposes of the refuge, biological and botanical assets, archaeological and cultural values, and compatible wildlife-dependent recreational uses. 16 U.S.C. § 668dd(e)(2)(A)-(F). The statute cannot be read to provide an answer about how these interests must ultimately be harmonized at a given refuge, and, indeed, that is why the FWS was required by Congress to prepare a plan for each refuge to determine how each refuge shall be used.

■ It is this inherent and intended statutory ambiguity—the proper use of the refuge—that requires the Service be given very wide, or so-called *Chevron*, deference when I review the CCP and its implementation, including the related license denial. See *Chevron U.S.A. Inc., v. Natural Res.*

*Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (" 'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress' " and administrative agencies will thus be afforded wide discretion when filling those gaps) (citations omitted). Wide deference is particularly appropriate here because the FWS must not only consider for itself the statutory factors, but it must also, pursuant to 16 U.S.C. § 668dd(e)(1)(A)(ii), solicit and evaluate public comments regarding the development of the comprehensive conservation plan. See, e.g., *United States v. Mead Corp.*, 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (an "overwhelming number" of Supreme Court cases apply *Chevron* deference to the results of notice-and-comment rule making).

■ The deference owed administrative agencies in cases like this is "substantial." *Central S.D. Coop. Grazing Dist. v. Secretary of the United States Dept. of Agric.*, 266 F.3d 889, 894–95 (8th Cir.2001) (a decision by the Forest Service to reduce cattle stocking levels pursuant to a management plan for use of the Fort Pierre National Grasslands was accorded *Chevron* deference and affirmed). However, "deference" does not mean "rubber stamp." Among other things, even when *Chevron* deference is due, a court should ask whether the agency: (1) has relied on factors which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) has rendered a decision that is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise. *Id.* at 894 (citation and quotation omitted).

With these principles in mind, I turn to the two arguments of the plaintiffs which merit discussion. That examination follows.

### The Validity of the Moratorium

■ The plaintiffs first attack the moratorium, reasoning that if it fails, then the denial of the license will fail as well because that decision was based upon the moratorium. I conclude that the moratorium was lawful.

As earlier indicated, the Service found that river usage had dramatically increased over a short period of time. In the CCP, the Service found that between 1993 and 1997 the rate of increase was steep (about 30%). It rose from about 23,000 visitations to about 30,000 visitations annually in just four years. (CCP, p. 8.)

The moratorium challenged by the plaintiffs and the reasons for it are described in detail in the CCP. (*E.g.,* CCP, pp. 21, 45.) In particular, the Service gave this long explanation:

### Recreational Use and Resources of the Niobrara River

Many people, groups, and agencies were concerned, for various reasons, about the Service's current and proposed policy on access to and management of the Niobrara River resources for recreational use.

*Limiting Access to the Niobrara River:* The Service has grown increasingly concerned over the possible environmental effects that the current burgeoning use of the Niobrara River resources by River floaters may be having on riparian and upland Refuge resources, as well as on wilderness values.

Recreational canoeing and tubing use of the stretch of the Niobrara River designated as scenic by Congress has increased dramatically in the past few years. In response to this, the Service has attempted to alleviate effects on Refuge resources (riparian habitats and the wildlife that depends upon it, wilderness values, etc.) by placing a temporary limit on the number of outfitter Special Use Permits issued by the Refuge and a cap on use while the environmental effects of this use are assessed. Furthermore, this temporary limit in use is expected to contain the overcrowding situation that has developed on this stretch of the Niobrara River and degraded the quality of wilderness experience. This temporary measure has been criticized as unfair, inadequate, and without basis on hard evidence and science. However, the Service believes that this interim management policy is better than complete shutdown of River use on this stretch of the Niobrara River (worst case scenario) as discontinuing all use would be no more justifiable than allowing uncontrolled growth of use. At this time, there is no logic in depriving all visitors of the wilderness experience.

*Management Plan:* The Service will prepare a Management Plan in the next two years dealing exclusively with the recreational use of the scenic Niobrara River as it flows through the Refuge. This Plan will be prepared by the Service with the participation of all interested parties, such as the National Park Service, the Niobrara Council, all River outfitters interested in participating, and any city and county officials interested in being part of this effort. The Plan will define acceptable use levels for weekdays and weekends that meet legal mandates. Also, actions to be taken when uses exceed threshold levels or negatively impact resources, and wilderness values will be clearly defined.

In the interim, River use will be capped at the 1998 levels and the moratorium on new outfitters will continue. Weekend and weekday use will be monitored along with habitat, wildlife, erosion, and social parameters to determine threshold levels.

It is not the intention of the Service to obstruct the development of a recreational and revenue-producing enterprise such as River use outfitting, but rather to ensure that this use continues to be compatible with Refuge goals and objectives and with the requirements of the Wild and Scenic River Act and the Wilderness Act promulgated by Congress for the benefit of the American people. The Service believes that the wise use of the River for recreational purposes will, in the end, be beneficial, not only to wildlife, but to the community as well. It is our belief that any decrease in use by River floaters is caused more by a degrading "wilderness" and "wild and scenic" experience caused by too many visitors at certain times of the year, rather than by the Service's limits on Special Use Permits. Ensuring visitors a wildlife-oriented as well as a wilderness experience when using the River would also ensure a healthy tourist industry for the City of Valentine and Cherry County.

While not presently documented on Fort Niobrara NWR riparian habitats along the wild and scenic Niobrara River, a large body of research exists (mostly from studies conducted in California, Colorado and in eastern states) on the issue of effects on migratory birds as public use of rivers increases. Heavy recreation use of riparian areas during the summer (bird breeding season) can have devastating effects on the avifauna, during all portions of their natural history cycle. Riparian habitats are one of the most important wildlife habitats occurring in the Service's Region 6. Seventy-five percent of the terrestrial species occurring in this Region are dependent on riparian and adjacent aquatic zones during some portion of their life cycle. The effects of heavy recreation on the riparian habitats and its associated wildlife species is two-fold: disturbance to the individuals, and disturbance to the vegetation used by wildlife. These effects have not been fully assessed for the riparian habitats of Fort Niobrara NWR. The Service, as a precautionary measure, decided to place limits on recreational use of the segment of the wild and scenic Niobrara River that flows through the Refuge until these effects can be qualified and quantified. The Service's mission is the preservation of wildlife and the habitats on which they depend. Recreational use of Refuge lands must come second to wildlife and be carried out in a compatible way with the purposes of the Refuge. Thus, the necessary use limits at this time until a River Management Plan is developed and implemented.

(CCP, p. 21 (emphasis in original).)

Despite this explanation by the Service, the plaintiffs make two related arguments regarding the invalidity of the moratorium. First, they argue that "there is no empirical evidence" to limit the number of permit holders or to "grandfather" existing permit holders. (Filing 17, Pls.'s Br. in Supp. of Mot. for Prelim. Inj. Relief at 17.) In that connection, they also point out that the Refuge Act, 16 U.S.C. § 668dd(k), regarding emergency protective measures, requires that before emergency measures are instituted the Service must "determine[ ] that it is necessary to protect the health and safety of the public or any fish or wildlife population." 16 U.S.C. § 668dd(k).

I, assume for the sake of argument, that 16 U.S.C. 668dd(k) applies to a CCP. That

said, there are ample, although necessarily tentative, facts found by the Service in the CCP to justify the moratorium. For example, the CCP sets forth the following facts and factually based reason for the temporary moratorium: (1) while canoeing is generally compatible with use of the Refuge and the river, over a short period of time canoe usage increased significantly (CCP, p. 8); (2) studies in other areas have shown that "[h]eavy recreation use of riparian areas" can have "devastating" effects on nesting birds (CCP, p. 21); and (3) "as a precautionary measure," the Service decided to "place limits on recreational use of [the river] until these effects can be qualified and quantified." (*Id.*)

Given the documented evidence of rapidly increasing canoe usage and its potential for "devastation" of nesting birds, it was entirely reasonable for the Service to impose a moratorium. Answering the "how much is too much" question is one of the most basic functions of the Service. Allowing the status quo to be maintained but not expanded, while taking time to get good science to answer this critical use question, was certainly not arbitrary, capricious, an abuse of discretion or contrary to any law.

### *The Validity of the License Denial*

■ The plaintiffs next attack the license denial. Condensed, their argument is this: Even if the moratorium was valid, by 2003 river usage had significantly declined and the river management plan (RMP) was long overdue; therefore, there was no legitimate basis for denying a license to the plaintiffs since the plaintiffs' usage would not have caused total river usage to exceed the usage cap set by the CCP. I reject this challenge as well.

First, the fact that river usage may have declined by 2003 does not demonstrate that the moratorium on new permits must be disregarded by the Service. A plain reading of the CCP shows that the Service allowed the status quo to be maintained until the science could be developed to determine what usage levels were appropriate, but it clearly and reasonably did not promote maintenance of the status quo. Bluntly put, the fact that 1998 usage levels could be tolerated did not mean that 1998 usage levels should be promoted. The desire not to promote 1998 usage levels until the science was completed was the obvious and justifiable reason for a moratorium on *new* permits. Therefore, at least until the studies were done, there was nothing improper about denying a license to a new user even though river usage by former users had declined.

Second, the fact the RMP was long overdue at the time of the license denial is troubling, but not reason enough to invalidate the decision. The undisputed evidence reveals that the Service was pursing a peer-reviewed study before deciding how to set river usage guidelines, and the undisputed evidence reveals that the study is very near to being completed. Even though the Service imposed a deadline on itself in this case,[10] courts typically do not strictly enforce deadlines against administrative agencies like the Service unless Congress requires strict enforcement. *See, e.g., Newton County Wildlife Ass'n v. United States Forest Serv.*, 113 F.3d 110, 112 (8th Cir.1997) (the failure of the Forest Service to meet a 3–year statutory deadline for a comprehensive management plan in the Ozark National Forest did not entitle environmental group to relief; "Absent specific statutory direction, an agen-

---

**10.** And, the Service should be complimented for doing so. It should also strive mightily to live up to its commitments.

cy's failure to meet a mandatory time limit does not void subsequent agency action.") (citations omitted). Congress has not mandated strict enforcement of deadlines in circumstances like this. Since the Service has provided sufficient and record-based reasons for the delay, at this point, I cannot conclude that the delay has been unreasonable.

The need for a good study, however, is not an open-ended excuse for delay. That scientists and academics are notoriously slow is well-known and the Service must necessarily do its work in that real world, but at some point delay becomes actionable. That is, when unreasonable, delay becomes arbitrary, capricious and an abuse of discretion. This court's patience is not infinite.

Finally, I agree with the plaintiffs that Congress has specifically told the Service that when it "determines that a proposed wildlife-dependent recreational use is a compatible use within a refuge, that activity should be facilitated...." 16 U.S.C. § 668dd(a)(3)(D). When compatibility has been established, this means canoeing must be facilitated. On the other hand, and in the same statute, Congress has given the Service the power to control such compatible uses by "restrictions or regulations" to the extent "necessary, reasonable and appropriate." *Id.* That means canoeing can be restricted and regulated.

There are stray references in the record which might indicate that the Service is less than enthusiastic about recreational uses. For example, the CCP states that "[r]ecreational use of Refuge lands must come second to wildlife...." (CCP, p. 21.) I do not know what these words mean. Taken literally, they could be read to ignore, or at least evidence an important

misunderstanding of, the first portion of the statutory directive of 16 U.S.C. § 668dd(a)(3)(D) regarding facilitating compatible recreational uses. To be clear, when Congress tells the Service to facilitate compatible recreational uses like canoeing, those activities must become an important priority for the Service.[11]

In summary, when the record is reviewed as a whole, I am satisfied, at least for now, that the Service has properly understood and applied the statutory language including its power to restrict and regulate compatible uses like commercial canoeing. Although the delay in promulgation of a river management plan is problematic, the license denial was not improper.

### III. CONCLUSION

Although I have great empathy for the plaintiffs and their plight as they wait for the government to do its duty, they have not proven that the Service violated the law when it denied them a license to conduct their canoeing business. Therefore,

IT IS ORDERED that judgment will be entered by separate document providing the plaintiffs shall take nothing against the defendants, and this case is dismissed with prejudice.

### JUDGMENT

Pursuant to the court's Memorandum and Order previously filed in this matter, final judgment is entered in favor of the defendants and against the plaintiffs, providing that the plaintiffs shall take nothing as against the defendants and the plaintiffs' complaint is dismissed with prejudice.

---

11. In this regard, the Service must read 16 U.S.C. § 460k in harmony with the more re-

cently enacted provisions of 16 U.S.C. § 668dd(a)(3)(D).